**In re LCL INCOME PROPERTIES, L.P. VI d/b/a Clough Creek Apartments, Debtor.**

Bankruptcy No. 94–14473.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Jan. 30, 1995.

Margaret W. Burgin, Cincinnati, OH, for debtor.

Richard Boydston, Cincinnati, OH, for Clough Creek, Ltd.

Sara M. Petersmann, Cincinnati, OH, for Beal Banc, S.A.

Alan J. Statman, Cincinnati, OH, for IMG.

## DECISION and ORDER ON § 543 MOTION BY CLOUGH CREEK, LTD.

BURTON PERLMAN, Bankruptcy Judge.

This is a Chapter 11 case involving a 164–unit residential apartment complex owned by the debtor. The debtor is a New Jersey limited partnership of which the general partners are brothers Joel and Elliot Leibowitz. The complex is located at 6375 Clough Pike in Anderson Township, Hamilton County, Ohio. It will hereafter be re-

ferred to as the "subject complex." Prior to the bankruptcy, the second mortgagee, Clough Creek, Ltd. ("CCL") had filed a foreclosure action and in connection therewith had moved for a receiver. Insignia Management Group ("IMG") was appointed as the receiver. The Bankruptcy Code at § 543 requires that upon the filing of a bankruptcy, a custodian turn over property in its control to the debtor unless such turnover is excused. CCL, in its present motion, seeks that such turnover in this case be excused. The motion is opposed by the debtor. The motion came on for an evidentiary hearing in this court.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(E).

We find pertinent facts as follows. The debtor limited partnership acquired the subject complex December 9, 1987. It remained in possession until the receiver was installed in October, 1992. Debtor paid $5.6 million for the subject complex. The terms of the purchase were that Tennessee Trust Company lent $3.5 million and took a first mortgage; the seller, a predecessor of CCL, took a second mortgage for $500,000.00; and the purchaser paid $1.6 million in cash. Tennessee Trust served as trustee for CCL on the second mortgage. The first mortgage is currently held by Beal Banc, S.A. The note held by CCL in connection with the second mortgage was due and payable in full on December 9, 1992. Debtor's arrangement had been at the time of purchase to pay interest only on the second mortgage until December, 1992, and at that time to make a balloon payment on the second mortgage.

Elliot Leibowitz and his brother Joel, general partners of the debtor general partnership, also operate a partnership, LCL Management Company, which managed the subject complex prior to the installation of the receiver. The subject complex during management by LCL Management was staffed by a resident manager, two maintenance persons and a cleaning person. Above this staff was a property manager based in Louisville who reported to Elliot Leibowitz, the Louis-

ville property manager supervising four properties in all. If the present motion were denied and turnover were to occur, the Louisville property manager would immediately come to Cincinnati and take charge of the subject project.

Elliot Leibowitz and Joel Leibowitz are each in a Chapter 11 bankruptcy case in New Jersey. LCL Management is outside those bankruptcies.

Debtor defaulted on its second mortgage obligation in August, 1992. Debtor attributes this to a fire which occurred at the subject complex. The subject complex consists of ten independent multi-apartment units. A fire occurred January 22, 1992 in one of them. It started in the laundry room. There are 17 apartments in that building. As a result of the fire, eight were gutted and nine were heavily smoke damaged. The tenants of the damaged building were moved to other apartments in the subject complex, though two or three of them moved out. The fire affected debtor's rental program in part because the burned out building was directly across from the rental office and made a bad impression. Another negative effect of the fire was that tenants in other units were fearful that a fire such as that which had occurred might occur in their unit, and consequently some tenants left.

Debtor had insurance for the fire damage. It took three months before repair work was begun, and about a year before the repair work was completed. In pursuing its insurance coverage, debtor hired a public negotiator and settled with the insurance company for 100% of the replacement costs. Debtor was required to put the job out for bid. The first mortgage holder had to approve the successful bidder. The cost of repair was estimated to be in the neighborhood of $400,000.00 to $500,000.00. It took debtor three months to get an advance on the insurance settlement. This was $150,000.00. The remainder of the award was placed in escrow at the American Savings Bank. That bank was taken over by the FDIC which then refused to make any disbursements to the debtor, and debtor was compelled to litigate with the FDIC in order to get its money. Meanwhile, debtor paid $109,000.00 out of

partnership funds in order to get the repair work done. Litigation with the FDIC did not conclude until after the receiver was installed in October, 1992, and final payment on account of the insurance proceeds was not received until that late date.

Debtor was unable to make the balloon payment which it had intended to make as a result of refinancing in December, 1992, when the second mortgage note matured. Debtor also stopped making payments on its first mortgage. Prior to the fire, debtor had always been current in its mortgage payments. Debtor received some relief on account of problems stemming from the fire when it reached an agreement with Jeffrey Goldberg, a principal of Tennessee Trust, pursuant to which debtor was allowed to make 50% interest payments in October and November, 1992, on the second mortgage note.

It was the testimony of Elliot Leibowitz that the second mortgage holder was cooperative during the latter part of 1992 when debtor was feeling the effects of the fire. Because of the amicable relationship at that time, Elliot Leibowitz felt betrayed when the foreclosure complaint was filed October 30, 1992. As we have seen, a receiver was installed at that time by the state court. The foreclosure suit was filed by CCL. CCL was granted summary judgment, the motion for which was unopposed by debtor, on June 9, 1993.

A foreclosure sale was set for September 2, 1993. CCL did not go forward with the sale because debtor informed it that it had a buyer who would take out the second mortgage. This take out did not occur, and debtor could not perform its undertaking. Again, on May 6, 1994, debtor informed the second mortgagee that its note would be paid off, but again this did not occur. The subject complex was set for a foreclosure sale again on December 1, 1994. The sale was prevented from happening because debtor filed the present bankruptcy case. Leibowitz testified that bankruptcy was not filed in 1992 and for a long period thereafter because the parties were negotiating settlement. Another effort to refinance and pay out LCL occurred subsequent to the bankruptcy filing, with the

parties agreeing that the second mortgage would be paid out by December 3, 1994. Once again, debtor was unable to make this happen. Leibowitz explained that the reason that it could not happen was because CCL required payment in 1994, while his money source required a dismissal of the bankruptcy case before it would release funds, and a dismissal order plus the ten-day appeal period thereon would not expire until after December 31, 1994, and so the deal collapsed.

■ We turn then to a consideration of the controversy presented by the parties. The pertinent statute, to the extent here relevant, provides:

### § 543. Turnover of property by a custodian

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

\* \* \* \* \* \*

(d) After notice and hearing, the bankruptcy court—

(1) may excuse compliance with subsection (a), (b), or (c) of this section, if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property

\* \* \* \* \* \*

Thus, the statute prescribes an interests of creditors test in deciding the present motion.

In addition, the testimony was undisputed that the debtor is not insolvent, and so its interest as the equity holder must be considered.

As a preliminary matter, we turn to a contention that debtor believes should resolve the present motion. The debtor contends that IMG should not be permitted to continue as custodian of the subject complex because it is not "disinterested" as that term is defined at 11 U.S.C. § 101(14). More specifically, debtor contends that IMG has a conflict of interest because it is organizationally related to CCL, the holder of the second mortgage. IMG, the receiver, is a wholly-owned subsidiary of Insignia Financial Group, Inc. ("IFG"). Linda Pentaleri, asset manager employed by IFG, negotiated with the debtor in connection with efforts to reach a settlement between debtor and CCL. Debtor contends that the evidence establishes that Pentaleri directed the affairs of IMG, and improperly dictated its conduct to the benefit of CCL. As further evidence of management of the affairs of IMG in favor of CCL, debtor offered evidence that an attorney, Marilyn Eddy, performed work for the receiver and billed it to IFG. Eddy refuted this contention by testifying that she did work for both the receiver and for IFG and billed them separately. Debtor says that further support of its contention of improper conduct of IMG affairs in favor of the second mortgagee, was evidence that payments were made on the second mortgage, and that interest in such payments was charged at a compounded rate. Contrary testimony was that it was desirable to make payments on the second mortgage in order to reduce the secured indebtedness upon which it was necessary to pay interest.

■ We have dealt with the subject of disinterestedness at some length because considerable evidence on the subject was offered at the trial. One notices, however, that there is no statutory requirement for disinterestedness of a custodian to be found in the statute. Debtor purports to find such a requirement in case law, citing *In re Posadas Assoc.*, 127 B.R. 278 (Bankr.D.N.M.1991), for this purpose. Such reliance by debtor, however, is misplaced. Disinterestedness in *Po-* *sadas* is not imposed upon a custodian during a bankruptcy, but only on professionals hired by that custodian. We decline to import a requirement of disinterestedness into § 543.

■ But even if there were such a requirement, the court is left unpersuaded by the evidence that there has in fact been control of IMG exercised by the second mortgagee. Except for the self-serving testimony by Leibowitz that he would not include in his base upon which a percentage is calculated to arrive at a management fee, items which were included by IMG, there is no evidence that IMG's basis was improper. Calculation of interest due LCL at 24% was reduced to 15% upon the protest of debtor, though Eddy contended that 24% was indeed correct. Even if it were appropriate to raise questions about the propriety of charges made by IMG in conducting the affairs of the receivership, the receivership was in place for over two years prior to the filing of the bankruptcy, and debtor tolerated the conduct over that period of time without objection.

■ We next turn to the argument of CCL in support of its motion that debtor mismanaged the subject complex prior to the receivership of IMG. Case law holds that mismanagement by debtor is to be considered in deciding a motion such as the present one. *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D.Ohio 1989). The way in which this issue plays out in the present matter is as follows. In the matter at bar, each party urges that mismanagement had occurred while the other party's custodian was in possession, and each offered evidence to support its contention. Debtor goes further and argues that anything which appears to have been mismanagement on its part was caused by the fire and is therefore excusable. Neither side, however, persuades us of mismanagement by the other, for during possession by each, except for the year of the fire, comparable results were shown in profitability of the enterprise.

Taking into consideration the interests of creditors and debtor, we have reached the conclusion that the motion should be granted. In support of our conclusion, we observe that

debtor has on three occasions believed that it had in place a refinancing arrangement, but in each instance it was unable to make the refinancing happen, despite the general agreement of the parties that there is equity in the subject complex. One of these efforts to refinance occurred after the bankruptcy was filed, so it appears that continuing the receivership is not detrimental to debtor's efforts to reorganize. Further, in the event that reorganization does not occur, it would appear that the second mortgagee would be in a position to proceed with its foreclosure. Were that to happen, doubtless it would reinstall the present receiver. The dislocation in management caused by two changes in management organization would obviously result in unnecessary trouble and expense. By leaving matters in the status quo as it has existed for more than two years, debtor will have the opportunity to reorganize contemplated by the bankruptcy laws, and at the same time the interests of creditors will be protected. While debtor resists this result by asserting that IMG is not a fit entity to operate the subject complex, we hold that debtor either is incorrect in this position, or has waived its right to raise the point, because it failed to object to the practices of IMG for the more than two years that IMG has managed the subject complex.

The motion is granted.

CCL and IMG shall, on a reasonable basis, give debtor any and all necessary access to the books and records in their possession or control relating to the subject complex, so that debtor may prepare the documents necessary to the pursuit of its bankruptcy case.

So Ordered.